May I have one moment to grab a water, please? Certainly. Thank you. Thank you. Thank you. Thank you. Thank you. May it please the court, I'm joined by Attorneys Craig Fishbein and Doug Dubitsky at counsel's table. Kitano to us is the critical case in this case. And the reason why we think Kitano is critical is not because of Justice Alito's concurrence, but what Kitano actually did in issuing a judgment. The Massachusetts Supreme Judicial Court issued definitions as to both dangerous and unusual. It defined both elements. The Supreme Court only, in our view, corrects the Massachusetts Supreme Court's findings on the unusual prong. It vacates the Kitano conviction, and it sends it back down for proceedings not inconsistent with the Kitano per curiam decision. That unequivocally spells out that the test is conjunctive, not disjunctive, as the district court found here, or unusually dangerous. Where that gets us in the context of this case in this discussion, and going directly to Judge Nathan's M-16 question, is when Heller discussed M-16s, it's throwing out these things as broad responses to the dissent in Heller. And so it doesn't embark on an exhaustive historical analysis of the term dangerous and unusual. It doesn't embark on a database inquiry into M-16s. What do you mean by that? Do you mean we're entitled to say, oh, they didn't really make a determination that an M-16 was dangerous and unusual? What I would suggest to you is post-Buren, that is subject to the dangerous and unusual analysis outlined in Heller, applied in Kitano. And the Supreme Court has certainly given you some pretty strong dicta about where it thinks the line is, the line between semi-automatics and automatics. But so, I mean, just Rahimi does accurately quote Blackstone, which is what Heller was quoting. And it says, in Rahimi, which is our most recent pronouncement, if this is the test, I mean, if the whole ballgame is, is it the and, which it seems like that's your contention, then you have to grapple, I think, and I'm not sure that it is, but I was just amazed at how much emphasis is put on this in the briefs, that it's the conjunctive. And as my questions show, I'm not even sure if in the conjunctive we can say for sure what it means. But Rahimi quotes that portion of Heller, citing Blackstone correctly as dangerous or unusual. So if that's the whole ballgame, then how do you grapple with Rahimi? Two ways we deal with Rahimi. First, we look back to the Supreme Court with a directly on-point decision in Kitano, where it is a conjunctive test. The second- It was necessary to the judgment that it be a conjunctive test. Correct, Your Honor. And then we look at the, I do agree with Mr. Arrington that there is a split in the historical sources on how those phrases are treated. But we go a little step beyond that, and we have a different historical analysis than Professor Cornell on this point. We look at where these words originally came from in the disjunctive sense, the statue of Northampton. And we immediately look at what's the clause that immediately follows these two words. It's the aphraic language. It serves as a limiting clause. Then we look through English history, whether it's Sir John Knight's case, whether it's the Baron Sniggy case, and we examine how this is applied in history. And the only cases we can find are cases that are addressing offenses of aphraic. So broad principle, historical analog, is legislative action against the use of weapons in the terrorizing of people. Is that the right way to think about the historical analog? I think it's a helpful way to think about the historical law analog, but not necessarily in light of Chitano and Heller, the most consistent way to think about that analog. I think we look at numerosity. That's indisputably part of this test. And then we're left with the dangerous prong, which we have spent many hours trying to find guidance as to what dangerous means, as I'm sure you have. The only historical definition that we could come up with that's consistent from the original sources that the test derives from is it's got to be linked to the aphraic conduct. Now let's talk possession. Possession bans were incredibly rare throughout history. The historical regulations that were ruled. But take the statute of Northampton, which you started with. The weapons that it's regulating to prevent the use of aphraic, to prevent the terrorizing, I presume those were weapons broadly, including weapons in common use, were they not? Yes, they were. And the reason why we place such emphasis on aphraic and that our test being most consistent with the historical record right now is history was concerned with not necessarily regulating mere possession but conduct with these. Obviously, there needs to be some flexibility because today we have technological advances such as the nuclear bomb. I can't walk down the street with an atom bomb in my briefcase. Nobody would agree that the Second Amendment would protect something like that. Why? Well, we look at, one, it's unusual. If it goes unbanned and then proliferates, is it your view that the Second Amendment would protect it? Is that the right understanding? No, and the reason why the Second Amendment wouldn't protect it is it would not be in use for lawful purposes. And two, it's dangerous, constitutionally dangerous, not abstract dangerous. How do we get to constitutional dangers in this regard? We're looking at a weapon. Take the atom bomb, for example, that the mere possession of is going to create an aphraic. It's going to objectively terrorize people. Apply that to closer cases. Machine guns are not an issue in this case, and they would have to undergo their own Bruen analysis. How is that? I mean, you're making, I don't disagree with you, but it sounds like a policy judgment that a legislature makes as to what is sufficiently terrifying to its community to which it is democratically accountable. And the community of Connecticut has decided following the massacre of children in Sandy Hook that what terrorizes and therefore fits into what you've admitted is the historical analog of regulating weapons against use that terrorizes the community, it has made that judgment in a democratically accountable way with respect to assault weapons, hasn't it? And you say no, but the Constitution tells us that it would be true with respect to a handheld nuclear weapon, but the Constitution doesn't permit the democratically accountable legislature to make that decision with respect to weapons that can shoot off the number of rounds that these weapons can in a certain amount of time. I just don't understand that as a constitutional distinction as opposed to just a pure policy distinction. I see my time's up, may I reply? So there's a lot to unpack there. I'm going to do my best. First, we don't agree that it's a modern legislative policy question to unpack. Bren was very clear that the Second Amendment itself was a democratic policy choice. And so what we're really looking at on the dangerous prong is what the framers of the Second Amendment understood it to be the policy choice they made. There's no history in the United States of a ban of the most commonly owned semi-automatic firearm in the country right now. In terms of dangerousness, looking at the fray, et cetera, dangerous has to flow from a constitutionally objective standard, not what the legislature subjectively concludes of, oh, somebody might get scared by looking at these or something like that or it might pose a harm. It's got to be constitutionally objective. That's why we suggest the fray component. In terms of the suitcase bomb, we're not citing that as the legislature can just willy nilly say this is too dangerous, don't have it, et cetera. Still got to go through the dangerous and unusual test. It's probably not going to be found usual for lawful purposes. And on the dangerous element, which it doesn't cease. We're in time. We start the regulation. Dangerous is going to look at the effects of this weapon and whether they're objectively terrifying to people. And we suggest that the common metric between the suitcase bomb and everything that falls thereafter is whether there's uncontrollable destructive potential. How about the M16? I think the M16 is a close case. Why is that? I think under the National Firearms Act, there are over 700,000 registered machine guns in the United States right now. How many? Over 700,000 is the data that I have seen. It would still have to go through a dangerous and unusual analysis. It would still have to pass the lawful purposes test. And again, I think the distinction we're also drawing here is a conduct-based ban on how I use one of these weapons might be historically justified, but there's no support for a possessions-based ban. That's why we submit to you that the M16 is a very, very close case as we see it because the tests being conjunctive. I mean, what would be the historical analog for a total ban on M16s? Well, Your Honor, I, again, would have to go through the application of the dangerous and unusual principle. I do know Gatling guns were a thing back prior to the Civil War. I'm not aware of any bans on Gatling guns. I'm not aware, if we're looking at not historical twins, but broader analogs. I'm not aware of cannon bans in the founding era. But so you would say, under your understanding of Bruin, if we were to apply that to M16s and we can't find a historical analog for a ban of any type of weapon, that even though Heller says M16s can be banned, we would have to conclude under Bruin that M16s cannot be banned. Is that? I'm not saying that. I'm saying it would be a close case because, one, I don't know. I would need to look at evidence of how these are being used, whether they're being used for lawful purposes. I would need to take a look at the dangerous kind. I would basically need to evaluate, as you would, in the context of a dangerous and unusual analysis, are these dangerous and unusual? That said, where we understand the legal line today and what we're operating on is that Heller said they can be banned. We're not challenging that proposition in this case. We're just trying to help you analyze this. And we keep asking because the AR-15s are not, they are semi-automatic. But when I've asked about the difference between the AR-15 and the M16, it's just the difference between whether the weapon is automatic or not, right? Yes, that, as we understand it, is the sole difference. Obviously, the other difference, I would believe, is the military has rigged them at certain points to select fire, the M16, which would switch between full auto, a three-round burst, and a semi-auto. Again, those would fall into more on the side of an automatic weapon, in our view, than a semi-automatic fire. Thank you, Your Honor. Good afternoon. Again, Joshua Perry on behalf of Governor Lamont and the other defendants in this case. So plaintiffs may think that the M16 is a close case, but the Supreme Court said it would be startling, that was their word, if an M16 could be banned. So the Supreme Court could not be banned, excuse me. So the Supreme Court has a very different take on the relationship between- Maybe they'd just be startled. Say? Maybe they'd just be startled. Maybe they would. Some things are startling. Maybe so, Judge Nathan. But certainly, this court's peers on the Seventh and Fourth Circuits would not be startled, because they held that one of the reasons why AR-15s can indeed be restricted and banned by a state is because M16s can be. Now, we've gotten deep into the question of whether dangerous and unusual means dangerous or unusual or not. Let me just reiterate, a conjunctive test is ahistorical. That's what our historians said. They may have a different historical analysis, but they didn't introduce any historian into the record saying that. Instead, what we have is- What about the Centano case, the judgment, being dependent upon a conjunctive use? Yeah, I don't understand how that is. I understood the holding in Caetano to be that the Massachusetts Supreme Judicial Court was wrong to consider whether something was in common use at the time of the founding rather than in 2016. That's where the Supreme Court reprimanded them. They never determined what dangerous and unusual meant. Certainly, again, this court's peers in the First, Fourth, and Seventh Circuits did not understand Caetano to be doing that. But look, even if dangerous and unusual somehow ahistorically is a conjunctive test, we still have two other important barriers that plaintiffs fail to clear at the threshold level. They still have not shown that these instrumentalities, LCMs and assault rifles are in common use for self-defense. At best, they've produced some ill-defined, vague, and now challenged possession statistics which have nothing to do with use. And they still haven't shown satisfactorily why these weapons are not just like the M16s, which it would be startling if states could not regulate. So let's go to the M16s for a minute. Same muzzle velocity, 330 feet per second. Same kinetic energy, 1,220 to 1,350 foot-pounds. Same effective range, same damage done. Martin Schreiber attests that the wounds that he saw in children on the streets of the United States were like the wounds that he saw inflicted by military rifles in war zones. Same rapid fire capacity. That's not my opinion. That's the Army Field Manual. And it's this court's peer in the Fourth Circuit, which noted that an AR-15 can empty its magazine of 30 rounds in as little as five seconds. And, of course, even if somehow how a weapon comes out of the box were constitutionally relevant, what the record shows here is that AR-15s are easily converted to M16 semi-automatic fire. In fact- So you say, and this harkens back to the Chief's question, you want us to understand textually arms, the word arms, to convey this meaning of, in common use for the purpose of self-defense. And I don't totally understand, I don't think what your answer to her was on that. And then the second part of the question is, that would seem to eliminate things, for example, weapons that are used for the purposes of hunting or the like. So your view would be, if there's a weapon that's for the purpose of hunting, that it's outside the meaning of arms within the amendment? No, but I appreciate the opportunity to clarify and to refine my answer to the Chief Judge. So obviously, we've been taught in Heller and Bruin, that what matters is the plain language, but it's not just the plain language as you or I would understand it, Judge Nathan, it's the plain language as historically understood, because as Heller taught, the Second Amendment encodes a pre-existing right. So what was that pre-existing right? It's the right that in 1689, the English Bill of Rights referred to as a right of self-defense. It's the right that Blackstone referred to as the right of self-preservation. It's the right that so many U.S. state constitutions, I believe 16 of them, including the Texas Constitution, that were written around the time of Reconstruction, in other words, around the time that the 14th Amendment ratified, explicitly encodes as being inextricably bound to self-defense. So in the plain language, as historically and contextually understood, in the original public meaning of these words, wasn't just that a weapon be literally a bearable arm, as the Seventh Circuit pointed out, that would mean that a 51-pound warhead would somehow have presumptive constitutional protection, but that's not at all what the Constitution means. So that's to the first part of your question. As to the second part of your question, Judge Nathan, about hunting rifles. So I think it's important to note that Connecticut has not banned hunting rifles. Those are, whether or not they're constitutionally protected, they're certainly democratically protected. And this goes to the point about numerosity, which is that it gets the logic of constitutional enforcement exactly backwards. As a rule, something that's popular doesn't need constitutional protection because it's popular. And hunting rifles certainly would fall into that category. As to whether Connecticut could restrict hunting rifles, I think we probably could not restrict hunting rifles because I think it could be shown that they are not unusually dangerous. They're not disproportionate and ill-suited in the way that, for instance, the Fourth Circuit found that AR-15s are. And the record might well show that they were used and useful for self-defense. I'll be honest that we haven't done that analysis, but I have no reason to think that that wouldn't be true. But look, even if I'm wrong, and even if the Constitution protects anything that is commonly used for any lawful purpose, plaintiffs still run into the significant barrier that they haven't adduced any of that use evidence as to any instrumentality. And they certainly haven't introduced that use evidence as to every instrumentality that they challenge in this facial challenge. And even if they had, they would still run into the fact that the weapons that they actually are charging, which we now learn on appeal are limited to AR-15s and LCMs, are just like M-16s and therefore can be restricted. Next, I wanna speak to the common ownership problem here, because we keep falling back on common ownership and it's anomalous, it runs contrary to precedent, it's illogical and unadministrable for some of the reasons, Judge Nathan, that you've already pointed to, and it's inadequate on plaintiff's own terms. So anomalous, I've already talked about. That constitutional rights, as the Supreme Court teaches us over and over, are defined by text and history, not by consumer choice. Precedent. Ruin doesn't talk about ownership, it talks about use for self-defense. And all the evidence in the records suggests that the use of these assault weapons for self-defense is vanishingly rare. And I point the court to Lucy Allen's declaration on that. Then we have other United States Supreme Court precedent. We have Miller, which never once considered how popular among consumers, thought of shotguns were. I'm sorry, on the use for self-defense, remind me of that part of the record. Is that how often the weapon is used in self-defense? That's exactly right. So Lucy Allen, who is a declarant in both records here, and I apologize that there are two records before the court, considered frequency of use in self-defense, but not just discharge, also brandishing in self-defense. And what she found is that it was vanishingly rare. In fact, what comes out of- Brandishing, and I'm sorry, that part of the record set me back a little bit, because it seems to me use for self-defense has to be broader than brandishing or actually using a weapon. I mean, most police officers never discharge a weapon outside the firing range over their whole career, but they are using the weapon for assisting other self-defense and other defense throughout that career. So that statistic didn't seem helpful. Am I missing something about that? So I think the textual point, Chief Judge Livingston, is that use has to mean something different than ownership. Otherwise, words have no meaning, and the Supreme Court spoke in vain here. And the kinds of use that we tested, and remember, we're at the threshold level, so proving use other than ownership certainly would not have been our burden. What we were able to adduce from the record is brandishing and actual discharge. But I'd also note that, for instance, when we talk about practical use, so for instance, Lewis Cloravis, another one of our declarants, found that out of 406 active shooter incidents in the database that he examined, only one actually featured an intervener with an AR-15, so that, as rare as the initial group of NAGR plaintiffs claim the use of AR-15s in mass shootings is, it's actually more common that they're used in mass shootings than that they're used to prevent mass shootings. And I want to end- Can I just ask, just, you know, trying to think about practically how courts should proceed with these tests if we are looking at this, do you understand the relevant timeframe if we are looking at evidence of common use for a purpose, for not a common purpose, to be the time of passage of the legislation or when the litigation is happening? Do you understand any geographic bounds? I mean, I can imagine if we don't have a federal ban, if one state bans it and others don't and it proliferates nationally, but what about the state that banned it originally? Is that suddenly unconstitutional? Does the state, I mean, if you're just, if you're trying to tell us what the doctrine is as a court in practical terms, trying to apply it this faithfully, how do you think about those questions? Yeah, so the questions that you're asking, Judge Nathan, go exactly to why the common use test doesn't make any sense. It imposes on Connecticut the very different policy choices that Texas chose to make over whether to make AR-15s common or not. And of course, as the First Circuit and Fourth Circuit and Seventh Circuits observed, and as the court has suggested here today, it's profoundly circular. It makes a law's non-existence into a reason why it can never be enacted and it makes a law's existence into a proof of its own constitutionality. And I'll note that creates a perverse incentive for legislatures. Because if state legislatures know that they can only ever regulate the moment an instrumentality enters the marketplace, lest it become too common and they can never regulate it again, then what that does is, what the Second Amendment is actually doing is incentivizing legislative over-regulation. That can't be what the Second Amendment, which protects people's liberties, is meant to do. But under plaintiff's numerosity, that's exactly what it's meant to do. So the Supreme Court has not spoken to geographic reach. The Supreme Court has spoken to lawful use today, which I take it does mean that the question is as of the time of the challenge, which again is another reason why it's important to speak to use, which can be tallied more easily in that context than ownership, which of course vacillates and changes over time. And as to, again, thinking about this in practical terms, I'm correct that Connecticut, through a registration system, permits the continued possession of these weapons in lawful possession prior to 2013, is that right? That's exactly right. So whatever the number was at the time that Connecticut decided to act, those lawful owners could continue to at least keep those arms. That's exactly right. The same is true for Connecticut's restrictions on others, which these sets of plaintiffs challenge and which were passed in 2023. Lawful possessors with registration can continue to possess, which is why it's accurate as to these individual plaintiffs to refer to these as restrictions rather than bans. And I know that I'm over time. Will the court permit me to just make one quick comment about restrictions rather than bans? So plaintiffs are factually wrong that there is not a rich history of restrictions at least as significant as Connecticut's restrictions. But even if they were factually right, what they would be doing is putting Connecticut in a regulatory straitjacket, not drawing on a principle, insisting on an analogical twin. We're in step two now? We are, because I'm out of time. Thank you, Judge Nathan. So of course there's a history of significant restrictions and these are enumerated and I'm not gonna bore the court with them at page 58 of our grant brief, but they include restrictions on sale and possession of Bowie knives. And that's particularly telling here because the difference between a Bowie knife is that a Bowie knife has some features that might seem even insignificant to you or I that make them particularly dangerous, right? A Bowie knife is just a big knife that has a clip point and a cross guard. And yet when these technological innovations entered into the marketplace, states all across the country, in the end all but one state began to impose significant restrictions up to complete restrictions on sale of Bowie knives. And that's exactly what Connecticut has done here. It's a direct analogical twin. Connecticut has said, look, you can carry more than 1,000 types of guns, but when you add these unusually dangerous features, which are just incompatible with a lawful and safe society, at that point you've crossed the line and the state will step in and regulate. So we actually do have tight analogs here. But look, what Rahimi teaches us is even if none of these restrictions which amounted to complete bans existed in the historical record, Connecticut would still be close enough. How do we know that? Because Zaki Rahimi faced a complete ban on possession of all firearms. He wasn't allowed to have a gun of any kind, any place, any way. And the Supreme Court said, well, that's justified by two strains of historical precedent. What were those? Neither of them complete bans. One of them, the surety laws, which may have required posting bail ahead of time, but didn't prevent people from obtaining weapons, and the other one, the affray laws, which may have punished people after the fact, but again, was not an a priori prohibition. So if that was close enough for Rahimi, we are well within the regulatory tradition, even if there is no regulatory tradition of bans, and there is. With that, I thank the court so much for its time and consideration. Will you rebuttal? Thank you, Your Honor. Wanted to go straight to the purposes analysis. McDonald resolves that fairly easy for you at page 780, where it uses lawful purposes, most notably for self-defense within the home. Third and fourth, seventh, and DC circuits all interpreted that as meaning all lawful purposes. The historical sources are in accord on that one. Second, Kitano certainly issued his judgment only on the unusual prong. If it was a disjunctive test, it would have had to reach dangerous. Third, in Connecticut, converting a semi-automatic firearm to an automatic firearm is illegal. It's already regulated that you can't cross an AR-15 over. Essentially, the unusually dangerous test creates the precise thing the founders sought to avoid, which is a sliding scale, where all of a sudden, 50% of weapons are too dangerous, then 25 down to zero, and all of a sudden, no weapons are dangerous, are not lawful or not protected by the Second Amendment. As to the state's point on over-regulation at the time that a weapon is manufactured, the conjunctive test actually protects citizens at that point because they can still prevail on the dangerous prong, even if they don't prevail on unusual. They can analogize to firearms and weapons already recognized as legal. I would certainly analogize these to the pistols protected in Heller. I see I'm out of time. Thank you, your honors, unless there are further questions. Thank you both. We will take the matter under advisement. Thank you, your honor. Nicely argued. Thank you, counsel. That's the last case to be argued today,